CC.B.

DONNA E. RICHARDS, #7625     **ORIGINAL**
MARK R. ZENGER, #3511
RICHARDS & ZENGER
Attorneys at Law, A Law Corporation
3016 Umi Street, Suites 204 and 212
Lihue, Hawaii 96766
Telephone: (808) 632-0723
Facsimile: (808) 632-0724

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JAN 0 7 2006

at ___ o'clock and ___ min. ___ M
SUE BEITIA, CLERK

Attorneys for Plaintiffs
CARL RAGASA and KANANI RAGASA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

CARL RAGASA and KANANI     )     CIVIL NO. 03-00540 BMK
RAGASA,                     )
                            )
                            )     **PLAINTIFFS CARL RAGASA AND**
          Plaintiffs,       )     **KANANI RAGASA'S**
                            )     **MEMORANDUM IN OPPOSITION**
                            )     **TO DEFENDANTS COUNTY**
   vs.                      )     **OF KAUAI, KAUAI FIRE**
                            )     **DEPARTMENT, DAVID SPROAT,**
COUNTY OF KAUAI, KAUAI      )     **ROBERT KADEN AND SIDNEY**
FIRE DEPARTMENT, DAVID      )     **KINI'S MOTION FOR SUMMARY**
SPROAT, ROBERT KADEN,       )     **JUDGMENT ON COUNTS I - IX OF**
SIDNEY KINI and ETHAN SAGE,)     **PLAINTIFFS CARL RAGASA AND**
                            )     **KANANI RAGASA'S COMPLAINT**
          Defendants.       )     **FILED ON OCTOBER 3, 2003;**
                            )     **DECLARATION OF COUNSEL;**
                            )     **EXHIBITS "A" through "I";**
                            )     **DECLARATION OF TERRY**
                            )     **CHUNG; DECLARATION OF**
                            )     **MYLES EMURA; DECLARATION**
                            )     **OF KALEO HOOKANO;**
                            )     **DECLARATION OF NORMAN**
                            )     **HUNTER; DECLARATION OF**
                            )     **GERALD HURD; DECLARATION**

**SCANNED**

)    **OF MARK MCKAMEY;**
)    **DECLARATION OF CARL RAGASA;**
)    **DECLARATION OF BRUCE STINE;**
)    **DECLARATION OF CLAYTON**
)    **WOLCOTT; CERTIFICATE OF**
)    **SERVICE**
)
)
)
)    **HEARING**
)    **DATE: JANUARY 24, 2006**
)    **TIME:  10:00 A.M.**
)    **JUDGE: BARRY M. KURREN**
)
)    **TRIAL DATE: April 18, 2006**

**(CERTIFICATE OF SERVICE ATTACHED)**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION.................................................................. 1

II.  FACTS RELEVANT TO THIS MOTION ................................. 2

    A.   The Conspiracy the Gave Rise to Carl's Arrest ................................. 2

    B.   Kaden and Kini .................................................................. 4

    C.   The KFD Water Safety Program Meetings ................................. 4

    D.   Kaden and Sproat Get Rid of Emura and Hookano ........................ 6

    E.   The March 20, 2002 Incident ................................................. 8

    F.   The March 22, 2002 Incident ................................................. 9

    G.   Carl's Arrest .................................................................... 10

    H.   Post Lawsuit Retaliation ...................................................... 11

III. APPLICABLE LEGAL STANDARD ...................................... 12

IV.  ARGUMENT .................................................................... 14

    A.   The Evidence, When Viewed in the Light Most Favorable to Plaintiffs, Clearly Shows that the False Arrest Was The Result Of Conduct By State Officials Acting Under Color Of State Law ..............................................................................14

    B.   Plaintiffs' Section 1983 Claims Are Not Barred By The Doctrine of Qualified Immunity.......................................................... 21

    C.   Plaintiffs' Have Shown That Alleged Wrongful Conduct on the

Part of Sproat, Kaden and Kini were the Result of Governmental Policy, Ordinance or Regulation Promulgated by the County of Kauai ............................................................................................ 22

D.   Plaintiffs have Presented Overwhelming Evidence that Sproat, Kaden and Kini Engaged in a Conspiracy Against Carl ............................. 22

E.   Plaintiffs Have Provided Evidence to Show that the County and KFD Knew of any Alleged Wrong Acts or Condoned a Conspiracy to Engineer a False Arrest ................................................................... 23

F.   Plaintiffs' Claims for Negligent and Intentional Infliction of Emotional Distress are Not Barred by the Workers' Compensation Exclusivity Statute ........................................................................ 23

G.   Plaintiffs' Have a Basis to Claim Entitlement to Punitive Damages ....................................................................................... 24

H.   Plaintiffs Have Met the Elements of False Imprisonment ................ 25

I.   Plaintiffs Have Met the Elements of Proof of Defamation .............. 25

J.   Plaintiffs Have Met the Elements of Proof of Malicious Prosecution ................................................................................. 26

V.   CONCLUSION ......................................................................................... 27

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Addickes v. S. H. Kress & Company*, 398 U.S. 144 (1970) .................................. 17

*Bendinburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990) ........................................ 17

*Celotex Crop. V. Catrett*, 477 U.S. 317 (1986) .................................................. 12

*Engle v. Liberty Mutual Fire Insurance Co.*, __ F.Supp.2d __, 2005 WL 3115102
(D.Hawaii July 11, 2005) ........................................................................ 12, 13

*Greenwich Citizens Comm., Inc. v. Counties of Warren and Washington Indus.
Dev. Agency*, 77 F.3d 26 (2nd Cir. 1996) ..................................................... 19

*Gottlieb v. County of Orange*, 84 F.3d 511 (2nd Cir. 1996) .................................. 20

*Johnson v. Knowles*, 113 F.3d 1114 (9th Cir. 1997) ............................................ 14

*Kenny v. Paderes*, 217 F.Supp.2d 1095, 1096 (D.Haw.2002) ............................. 13

*Kern v. Rochester*, 93 F.3d 38 (2nd Cir. 1996).................................................... 17, 18

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ............................................ 22

*N.A.A.C.P. v. Hunt*, 891 F.2d 1555 (11th Cir. 1990) ........................................... 17

*Ricciuti v. New York City Transit Auth.*, 941 F.2d 119 (2nd Cir. 1991) ................. 20

*Sorlucco v. New York City Police Dept.*, 971 F.2d 864 (2nd Cir. 1992) ................. 20

*Strength v. Hubert*, 854 F.2d 421 (11th Cir. 1988) ............................................. 17

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630
(9th Cir. 1987) .................................................................................... 12, 13

# TABLE OF AUTHORITIES

**Page**

*United States v. Classic*, 313 U.S. 299 (1941) ..................................................... 19

*Vanderlinde v. Brochman*, 792 F. Supp. 52 (N. D. I11. 1992) ............................ 20

*West v. Atkins*, 487 U.S. 42 (1988) .................................................................... 12

## STATE CASES

*Beamer v. Nishiki*, 670 P.2d 1264 (Haw. 1983) ................................................... 26

*Iddings v. Mee-Lee*, 919 P.2d 263 (Haw. 1996) .................................................. 24

*Masaki v. Gen. Motors Corp.,* 71 Haw. 1, 780 P.2d 566 *reconsideration denied,*
71 Haw. 664, 883 P.2d 899 (Haw. 1989) ................................................... 25

*Myers v. Cohen,* 67 Haw. 389, 688 P.2d 1145 (1984) .......................................... 27

*Sadie v. Martin,* 468 So.2d 162 (Ala. 1985) ........................................................ 17

## FEDERAL STATUTES

42 U.S.C. § 1983 .................................................................................................... 13

## MISCELLANEOUS

Restatement (Second) of Torts § 558 (1977) ....................................................... 26

iv

**PLAINTIFFS CARL RAGASA AND KANANI RAGASA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS COUNTY OF KAUAI, KAUAI FIRE DEPARTMENT, DAVID SPROAT, ROBERT KADEN AND SIDNEY KINI'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I - IX OF PLAINTIFFS CARL RAGASA AND KANANI RAGASA'S COMPLAINT FILED ON OCTOBER 3, 2003 (VIOLATION OF 42 U.S.C. §1983, CIVIL RIGHTS VIOLATION)**

## I.    INTRODUCTION

As demonstrated below, Plaintiffs' Section 1983 claims against the County Defendants should **not** be dismissed for three independent reasons.

***First,*** in order to state a claim for relief under Section 1983, CARL must, at a minimum, demonstrate that his alleged false arrest resulted from public officials acting under "color of state law." As discussed below and elaborated in the attached Declarations, CARL proves that SPROAT, KADEN and KINI orchestrated his arrest and prosecution for criminal harassment, and indeed that his arrest was made possible <u>only</u> because SPROAT, KADEN and KINI are clothed with the authority of state law conferred on them by virtue of their position within the Kaua'i County Fire Department.

***Second,*** Plaintiffs can show that SPROAT, KADEN and KINI were acting "under color of state law" when they reported Ragasa's wrongful conduct to the Kaua'i Police Department, and did so with willful, wanton and reckless negligence, and are not entitled to any type of qualified immunity.

1

***Third,*** Plaintiffs can prove that the acts of wrongdoing committed by SPROAT, KADEN and Kini resulted from a governmental "policy" or "custom" promulgated by the COUNTY OF KAUA'I in which the defendants were "clothed with the authority of state law" and did abuse that position given to them by the State.

## II.  FACTS RELEVANT TO THIS MOTION

### A.   The Conspiracy that Gave Rise to CARL's Arrest

This case started, in January 2001, when SPROAT placed command and control of all of the thirty (30) or so Water Safety Officers on Kauai under KADEN.  (Ragasa Declaration at Paragraphs 9 through 15).  By that time, Plaintiff CARL RAGASA ("CARL") and WSO Mark McKamey had for many years successfully maintained and administered full operational, training and rescue command control of all the North Shore WSOs. (Ragasa Declaration at Paragraphs 1 through 8).

A few weeks later, KADEN, started endangering lives by interfering with CARL and WSO McKamey.   Specifically, KADEN issued negligent orders to North Shore WSOs during a extremely large swell that hit the North Shore. CARL then told KADEN to stop interfering with the way that he runs the North Shore and KADEN got angry with him. (Ragasa Declaration at Paragraph 13).

2

CARL started to complain to others that KADEN was incompetent and presented a danger to public safety and the North Shore WSOs.

About that same time, CARL learned the KADEN was also trafficking in heroin. (Ragasa Declaration at Paragraphs 14 through 21 and the Chung Declaration at Paragraphs 7 through 14). From that point on, CARL wanted nothing to do with KADEN.

KADEN retaliated right away. He repeatedly stated at the workplace, "F—— CARL! I'm going to get him fired!" KADEN also devised a scheme whereby he was going to write a phony reprimand letter to CARL in and hand deliver it to him while wearing a wire. KADEN's plan was to make CARL angry and induce CARL to assault him so that he could have him arrested and fired. (Hunter Declaration at Paragraphs 7 through 9 ).

In the Spring of 2001, KADEN and SPROAT devised a scheme whereby they would fire CARL and replace him with experienced waterman Bruce Stine at Tower 1. (Stine Declaration at Paragraphs 4 through 22 ). At the same time SPROAT and KADEN were haphazardly attempting to tighten their grip on the Water Safety Program as a whole.

In June 2001, CARL learned from WSO Supervisor Nathan Hookano and Myles Emura that SPROAT and KADEN were going to further endanger the

3

public and the WSOs by assigning yet another fireman, KINI, to take over command, control and all training in the Water Saftey Program. CARL and WSO Supervisors Hookano and Emura joined forces to stop SPROAT and KADEN from appointing KINI (Ragasa Declaration at Paragraphs 24 through 30). KINI was neither certified nor qualified by the United States Life Saving Association ("USLA") for that position. (Ragasa Declaration at Paragraphs 24 through 30, Hookano Declaration at Paragraphs 16 through 30 and Exhibit "A" to the Zenger Declaration).

## B.  KADEN and KINI

KADEN and KINI had a long history together. In the 1980's KINI was a WSO that badly wanted out of the program so that he could become a fireman. However, he could not pass the fireman test. KINI therefore enlisted the aid of KADEN, who in 1990 "pulled strings" to get KINI hired at KFD, KINI's shortcomings notwithstanding. (Hookano Declaration at Paragraphs 6 through 15).

## C.   The KFD Water Safety Program Meetings

During the summer of 2001, KADEN further escalated his retaliatory actions against CARL. During regularly held meetings with the WSO Supervisor and SPROAT (the "KFD Water Safety Program Meetings") KADEN often told SPROAT and WSO Supervisors Hookano and Emura that he was having problems

4

with CARL and that he really wanted to fire him. (Hookano Declaration at Paragraphs 45 through 56, Emura Declaration at Paragraphs 15 through 18 and Exhibits "C" and "D" to the Zenger Declaration).

During the summer of 2001, KADEN went to Tower 1 while CARL was working. He told CARL that he wanted to delivered a letter to him alleging that CARL had violated Water Safety Program standard operating procedures. When CARL refused to take the reprimand letter from him, KADEN became angry, confrontational and combative and tried to induce CARL to hit him. CARL knew what KADEN's true agenda was and did not "take the bait." (Ragasa Declaration at Paragraphs 38 through 41). At other times in the summer of 2001, KADEN also attempted many times find cause to reprimand CARL on "manini" or perceived hyper-technical Water Safety Program violations. KADEN often falsely claimed that CARL had left his post at the Tower 1 Pavilion without authorization. (Hookano Declaration at Paragraphs 33 through 35 and Exhibits "C" and "D" to the Zenger Declaration). However, KADEN was unable to issue a valid reprimand to CARL because he was not doing anything wrong. (Ragasa Declaration at Paragraphs 6 through 33).

Meanwhile, SPROAT and KADEN continued their efforts to appoint KINI to take over command, control and training of the Water Safety Program. In

response thereto, WSO Supervisors Hookano and Emura uncovered and revealed information about SPROAT, KADEN and KINI having engaged in a variety of criminal activities to all who would listen. Recipients of WSO Supervisors Hookano's and Emura's information included the Mayor of Kauai, the Kauai County Council and the rest the KFD supervisory structure (Hookano Declaration at Paragraphs 57 through 66, Emura Declaration at Paragraphs 24 through 38).

## D.    KADEN and SPROAT Get Rid of Emura and Hookano

In order to retaliate against WSO Supervisors Hookano and Emura, SPROAT initiated an internal investigation that targeted them. (See Exhibit "B" to the Zenger Declaration). SPROAT's investigation did little save confirm that many WSO already suspected or knew that KADEN was involved in heroin trafficking. Nevertheless, on or about January 2, 2002, SPROAT and KADEN terminated WSO Supervisor Hookano and suspended WSO Supervisor Emura without pay. (Hookano Declaration at Paragraph 69 and the Emura Declaration at Paragraph 36).

CARL, who had long been closely aligned with WSO Supervisor Hookano and WSO Supervisor Emura, firmly believed that SPROAT and KADEN would come after him next. (Ragasa Declaration at Paragraphs 56 and the Emura Declaration at Paragraphs 52 through 56). He was right.

6

In February 2002, SPROAT and KADEN ordered KINI to go to Tower 1 and train all of the water safety officers, including those under CARL on the North Shore, in USLA certified open water lifesaving procedures right in front of CARL. Twice, CARL demanded that KINI show him his USLA certification card. Twice KINI refused and performed the training anyway. CARL knew full well that KINI was not USLA certified, but ceased and desisted in his efforts to stop KINI. CARL instead embarked upon a campaign of telling anyone who would listen that no WSO should allow KINI to train them in open water lifesaving procedures because he nothing more than a fireman who did not know what he was doing and who was not licensed and not qualified. (Ragasa Declaration at Paragraphs 75 through 78).

During that same time, SPROAT, KADEN and KINI together devised yet another scheme and artifice to terminate CARL. They recruited another North Shore WSO, Defendant Ethan SAGE, to instigate a fight with CARL at the work place. (Ragasa Declaration at Paragraphs 63 through 113).

To KADEN, SAGE was the perfect bait to frame CARL. By February 2002, KADEN and SAGE had a long history with each other. KADEN and SAGE had been "friends and 'partners in crime' for a long time". He and KADEN had been "making money dealing together for a long time." According to SAGE, he

7

was protected by KADEN and if anyone in Water Safety Program ever did something that SAGE took issue with, KADEN would make them "sorry" for it. (Wolcott Declaration at Paragraphs 22 through 28).  Employing KADEN's pre-existing relationship with SAGE and the collective powers of SPROAT, KADEN and KINI in their capacity as high-ranking county officials, SPROAT, KADEN had by February 2002 been exerting pressure on SAGE for a long time to get him to help them get CARL fired from his job.    SPROAT and KADEN made it clear to SAGE that if he failed to help them ensnare CARL, then SAGE would himself be fired (Ragasa Declaration at Paragraphs 110 through 114 and  Exhibits E, F, G, and H to the Zenger Declaration).

## E.    The March 20, 2002 Incident

On Wednesday, March 20, 2002, KINI yet again brought SAGE and others to a USLA open water training class to be held right in front of CARL.  While there  SAGE said, "look at the senior guards.  They don't know how to do their jobs!"  CARL replied, "get the f*** out of here.  Don't tell us how to do our jobs." (Ragasa Declaration at Paragraphs 79 through 86, the Hurd Declaration at Paragraphs 5 through 12 and the McKamey Declaration at  Paragraphs 3 through 13).

Thereafter WSO McKamey and CARL asked KINI to train SAGE and the

8

others elsewhere next time. (Ragasa Declaration at Paragraphs 87 through 89 and the McKamey Declaration at Paragraphs 3 through 13). The next day, CARL asked KINI again to train SAGE and the others elsewhere next time. KINI said, "I'll think about it." (Ragasa Declaration at Paragraphs 90 through 91 and the Chung Declaration at Paragraphs 15 through 20.

When KADEN heard of CARL's request, he ordered KINI to bring SAGE and the others back to Tower and conduct USLA open water training class to be held right in front of CARL. (Please See Exhibit 4 to the Chang Declaration).

**F.    The March 22, 2002 Incident**

On March 22, 2002, CARL was surprised to see KINI, SAGE and the others readying to train at Tower 1. CARL said to SAGE, "Good morning, diaper boy." SAGE replied, "CARL, why the f*** do you have to be so negative all the time." CARL then walked away from SAGE. (Ragasa Declaration at Paragraphs 93 through 99 and the Hurd Declaration at Paragraphs 13 through 21).

KINI next approached CARL, who said to him, "We told you Sid (KINI), don't bring (SAGE) around here. Why did you bring him over here?" KINI did not respond so CARL simply left the area for his morning run toward and down the beach. (Ragasa Declaration at Paragraphs 99 through 101 and the Hurd Declaration at Paragraphs 19 through 22).

9

## G.    CARL'S Arrest

On March 27, 2002, KADEN picked up SAGE on while both were on duty using a County truck from Tower 9 in Haena and ordered him to go with him, against SAGE's will and travel 50 miles away to the Kauai Police Department ("KPD") station in Lihue.  While there, KADEN ordered SAGE to make several false statements to KPD, with KINI and KADEN present, about what had happened at Tower 1 on March 20 and March 22, 2002 amongst he, CARL and KINI.

Succumbing to months of pressure and intimidation and under threat of losing his own COUNTY job from KADEN and SPROAT, SAGE lied to the police officer.  He falsely told KPD that CARL had sworn at him and threatened him with bodily injury several times on Friday, March 22, 2002.  For his part, KINI uttered the same lies to the police officer as SAGE.  (Hunter Declaration at Paragraphs 9 through 10 and Exhibits E, F, G and H to the Zenger Declaration).

Based on KINI's and SAGE's false statements of March 27, 2002, CARL was arrested at Tower 1 while on duty on Easter Sunday, March 31, 2002.  He was publicly placed in a marked vehicle and taken to the station.  There, he was fingerprinted, photographed, booked,  detained and charged with misdemeanor crimes.  (Ragasa Declaration at 102 through 104).

CARL was shocked at his arrest.   After all he had done nothing wrong.  He

knew right away that KADEN and SPROAT were responsible for his bogus arrest. The Court dismissed the Criminal Harassment Charges against CARL with prejudice in November 2002. (Ragasa Declaration at Paragraph 115). Plaintiffs subsequently filed the Complaint herein (Please See Exhibit 1 to the Chang Declaration). The lawsuit, however, failed to stop the COUNTY and KFD from further retaliation against CARL. (Ragasa Declaration at Paragraphs 131 through 137).

## H.    Post Lawsuit Retaliation

In late March 2005, the COUNTY and KFD, by and through Robert Westerman, a successor to SPROAT, contacted CARL and falsely accused him of theft by deception and defrauding his time records. The COUNTY and KFD again threatened him with criminal prosecution, this time for felony theft. CARL immediately contacted his Hawaii Government Employees Association Union Representative and his lawyers. An investigation was launched by them into KFD Chief Westerman's the false accusations of fraud and theft against CARL. The charges were unfounded. Once again, the COUNTY and KFD failed in its bid to get rid of and further discredit RAGASA. He was completely exonerated of any wrongdoing. (Ragasa Declaration at Paragraphs 131 through 137).

However, in April 2005, during the investigation of the unfounded theft and

fraud charges against CARL, KFD and the COUNTY, by and through KFD Chief Westerman, falsely accused CARL of being a substance abuse and a chronic alcoholic. KFD Chief Westerman therefore improperly ordered CARL in May 2005 to take a force leave with pay under the pretense of having take care of a substance abuse problem that CARL simply never had. On the first day of the forced leave, a physician examined CARL and certified him as having no substance abuse problem at all and cleared him to return to work at Tower 1 immediately. (Ragasa Declaration at Paragraphs 131 through 137).

## III.   APPLICABLE LEGAL STANDARD

To the extent that the arguments of Defendants COUNTY OF KAUAI, KAUAI FIRE DEPARTMENT, DAVID SPROAT, ROBERT KADEN AND SIDNEY KINI (hereinafter collectively referred to as "Defendants") may be supported by the law, genuine issues of material fact exist requiring the denial of their motion for summary judgment. In order for Defendants to prevail at this stage of the case, they must "demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987) (citing Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) and quoted in Engle v. Liberty Mutual Fire Insurance Company, __ F.Supp.2d ___, 2005 WL 3115102 (D.Hawaii July 11, 2005);

<u>Kenney v. Paderes</u>, 217 F.Supp.2d 1095, 11096 (D. Haw. 2002).

In considering the opposition of Plaintiffs CARL RAGASA and KANANI RAGASA (hereinafter collectively referred to as "Plaintiffs") to Defendant's "SUMMARY JUDGMENT ON COUNTS I - IX OF PLAINTIFFS CARL RAGASA AND KANANI RAGASA'S COMPLAINT FILED ON OCTOBER 3, 2003 (VIOLATION OF 42 U.S.C. §1983, CIVIL RIGHTS VIOLATION)" (hereinafter referred to as the "Summary Judgment Motion") all evidence and inferences must be construed in favor of Plaintiffs. "[W]hen 'direct evidence' produced by the moving party conflicts with 'direct evidence' produced by the party opposing summary judgment, 'the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.' <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. All evidence and inferences must be construed in the light most favorable to the nonmoving party. <u>Id.</u> Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. <u>Id.</u>" <u>Engle</u>, 2005 WL 3115102 at *3.

As shown herein, the evidence in this case, when viewed in the light most favorable to Plaintiffs, shows that for months, if not years, CARL was systematically targeted for termination by KADEN and SPROAT by any means

13

necessary. They recruited KINI and co-Defendant ETHAN SAGE ("SAGE"). The evidence at this stage of the proceedings shows that several persons, all of whom are Defendant COUNTY OF KAUAI ("COUNTY") employees, agents and/or representatives, committed of a long series of specific, carefully planned malicious acts all under the color of law against CARL's federally protected rights for more than a year .

## IV.    ARGUMENT

### A.    THE EVIDENCE, WHEN VIEWED IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS, CLEARLY SHOWS THAT THE FALSE ARREST OF CARL WAS THE RESULT OF CONDUCT BY STATE OFFICIALS ACTING UNDER COLOR OF STATE LAW

In order maintain a claim for relief under Section 1983 upon summary judgment , a plaintiff need only show that the facts, when viewed in the light most favorable to the plaintiff, show that (1) that the defendants acted under color of state law; and (2) that the defendants caused plaintiff to be deprived of a right secured by the Constitution and laws of the United States. See Johnson v. Knowles, 113 F.3d 1114, 1117 (9th Cir, 1997).

In this case, CARL's claim for violation for his constitutional rights stems from a conspiracy largely driven by KADEN's desire to get CARL fired from his COUNTY job by hook or crook. Whether KADEN's desire was fueled by his need

14

for revenge because CARL pointed out KADEN water safety incompetence back in February 2001, because CARL was preventing his long-time (but non- USLA certified) friend KINI to run the Water Safety Program, or anger at the thought that CARL was probably the one who was exposing him as a heroin traffficker is of little consequence.  What matters most at this stage of the proceedings is that KADEN and the others used their official capacities, using COUNTY vehicles, on COUNTY time, fighting over COUNTY policies in the COUNTY workplace, all the while hiding behind their COUNTY badges in their COUNTY uniforms, told lies about what happened in the workplace to deprive CARL of federally protected liberty interests.  Insofar as the COUNTY and KFD are concerned, what matter most is that they tacitly permitted, if not allowed KADEN and his crew to flout the law and public safety so that KADEN could have his way using the COUNTY and KFD as his front.

The evidence of the existence of a Section 1983 conspiracy among SPROAT, KADEN KINI and SAGE is overwhelming by any standard, let alone "light most favorable to the non-moving party."   The evidence  comes from the written and spoken word of one of the co-conspirators himself, SAGE.  (Please See Exhibits  E, F, G and H attached to the Zenger Declaration, hereinafter collectively referred to as the "Sage Conspiracy Admission Exhibits").  When viewed in the

light most favorable to the Plaintiffs, any reading of Sage Conspiracy Admission Exhibits compels a "slam dunk" in favor of all claims in the Complaint in this case upon summary judgment. If Defendants want to prove to a jury that SAGE made the Sage Conspiracy Admission Exhibits only because CARL heads a criminal conspiracy of his own, then they are free to do that at trial, not on summary judgment.

Moreover, Plaintiffs opposition evidence is comprised of much more than just the Sage Conspiracy Admission Exhibits. Plaintiffs have introduced nine (9) sworn declarations, when viewed in the light most favorable to Plaintiffs, prove the existence of and membership in the underlying Section 1983 Conspiracy as well as its scope and purpose: to get CARL terminated from the COUNTY by any means necessary.

Eight of the declarants, (Myles Emura, Nathan Hookano, Norman Hunter, Gerald Hurd, Mark McKamey, Bruce Stine, Clay Wolcott and CARL himself) are all COUNTY employees that worked with, saw and heard what the co-conspirators were doing and saying while they co-conspirators went about trying and, to an extent succeeding in destroying CARL's career, reputation and way of life. The remaining declarant, Terry Chung, knows two of the members of the conspiracy, KADEN and KINI all too well. He saw and heard acts that were committed in

16

furtherance of the Section 1983 Conspiracy.

Even without the Sage Conspiracy Admission Exhibits, the declarations of WSO Supervisor Emura, WSO Supervisor Hookano, WSO Supervisor Hunter, WSO Hurd, WSO II McKamey, WSO Bruce Stine, WSO II Clay Wolcott and CARL   are, in and of themselves, more than sufficient to withstand summary judgment as to al of the claims in this case, let alone the Section 1983 Conspiracy claim .

In <u>Bendinburg v. Dempsey</u> 909 F.2d 463 (11th Cir. 1990), the Court held that a plaintiff "attempting to prove such a conspiracy must show that the parties 'reached an understanding' to deny the plaintiff his or her rights. <u>Addickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); <u>Strength [v. Hubert]</u>, 854 F.2d [421] at 425 [(11th Cir.1988)] (citations omitted). The conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy. <u>Sadie v. Martin</u>, 468 So.2d 162, 167 (Ala.1985); <u>Strength</u>, 854 F.2d at 425." <u>N.A.A.C.P. v. Hunt</u>, 891 F.2d 1555, 1563 (11th Cir.1990). The cases that the COUNTY cites in its motions for summary judgment prove that the Plaintiffs have sufficient evidence to sustain the Section 1983 conspiracy.

Defendants' lead case in support of the Summary Judgment Motion is <u>Kern</u>

v. Rochester, 93 F.3d 38 (2nd Cir. 1996). The facts of that case are readily distinguishable from the facts of this case.

There, Union employee Wendy Kern alleged that she had been sexually discriminated against by her supervisor, Union President Daniel Cavuoto. Specifically, Ms. Kern alleged that Mr. Cavuoto subjected her to sexual harassment and assault. After the alleged assault, Ms. Kern brought her § 1983 action and, later, Title VII action against the city, union, and union supervisor.

The US Court of Appeals denied all grounds of her appeal and found that Mr. Cavuoto's actions as alleged where done solely in his capacity as the elected president of the union and not in his capacity as a Lieutenant in the Fire Department of the City of Rochester (the "RFD"). Further, Mr. Cavuoto's position as president of the union was the result of his being elected by other union members, and therefore did not involve any action by the City. Regarding her potential Title VII claims, the court found that the Union was not an "employer" as defined in Title VII.

In this case, CARL is an employee of the COUNTY and is supervised COUNTY personnel. All of the persons that harmed him were COUNTY employees and did so on COUNTY time and at the COUNTY workplace under the guise of performing official COUNTY functions. There is no outside agency or

18

private party involved in any way shape or form in this case.   Moreover, the main

right that CARL was deprived of was that of liberty.  There is nothing more central

to the protections afforded to our citizens by the United States constitution than

liberty interests .

Stated the Kern Court:

"In order to state a claim under § 1983, a plaintiff must allege a
violation of rights secured by the Constitution or laws of the United
States, and that such violation was committed by a person acting
under the color of state law." P. 43 *See Greenwich Citizens Comm.,
Inc. V. Counties of Warren and Washington Indus. Dev. Agency,* 77
F.3d 26, 29-30 (2d Cir.1996).

Moreover,  the U.S. Supreme Court has stated that '[t]he traditional

definition of acting under color of state law requires that the defendant in a § 1983

action have exercised power 'possessed by virtue of state law and made possible

only because the wrongdoer is clothed with the authority of state law.'"  West v.

Atkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (quoting

United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368

(1941)).  "It is firmly established that a defendant in a § 1983 suit acts under color

of state law when he abuses the position given to him by the State." *Id.*  at 49-50,

108 S.Ct. At 2255-56.

Given that fact that KADEN, KINI and SPROAT conspired, planned and

19

caused CARL to be falsely arrested on Easter Sunday in public while at work, any argument that the wrongdoer are not "clothed with the authority of state law'" are ludicrous.

In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy." Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir.1996).

Moreover, CARL had long been accusing the COUNTY of wrongfully endangering the public and the Water Safety Officers by blatantly failing to follow proper USLA procedures. His criticism was open, continuous and notorious. Plaintiffs have provided substantial circumstantial proof that the COUNTY "so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within the its jurisdiction.'" (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir.1991)). "The policy or custom need not be memorialized in a specific rule or regulation." Pg. 44 (citing Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870 (2d Cir.1992).

Likewise Vanderlinde v. Brochman, 792 F. Supp. 52 (N. D. Ill. 1992) is inapposite to this case. There two off-duty firefighters beat up two citizens who

20

were at a street crossing for no particular reason at all.   The only nexus to the municipality defendant in that case was that the fireman showed their badges to their victims and said the were "the law in Oak Lawn."

The facts of this case are not a "private brawl" between County off-duty employees.  KADEN, KINI and SPROAT were using their positions to get CARL out of the way so they could run the Water Safety Program the way that they wanted to.  Since they had no reason to fire him, they used County time, resources, equipment and personnel over a length period of time to get CARL falsely arrested in the hope that he would get convicted and then they could fire him.

## B.    PLAINTIFFS' SECTION 1983 CLAIMS ARE NOT BARRED BY THE DOCTRINE OF QUALIFIED IMMUNITY

Given the facts of the case as presented in Exhibits "A" through "I" of the Zenger Declaration and those contained in the declarations of Terry Chung Myles Emura, Nathan Hookano, Norman Hunter, Gerald Hurd, Mark McKamey, Bruce Stine, Clay Wolcott, CARL himself must be accepted as true and the inferences drawn in Plaintiffs 's favor, there can be no serious claim that any of the defendants in this case have any kind of applicable to what happened to CARL.

Whatever legal burden there might be to "overcome the presumption of qualified immunity," Plaintiffs  have clearly met it and then some.  See Sweaney

v. Ada County, Idaho, 119 F.3d 1385, 1388 (9th Cir. 1997)).

**C.    PLAINTIFFS' HAVE SHOWN THAT ALLEGED WRONGFUL
CONDUCT ON THE PART OF SPROAT, KADEN AND KINI
WERE THE RESULT OF A GOVERNMENTAL POLICY,
ORDINANCE OR REGULATION PROMULGATED BY THE
COUNTY OF KAUA'I**

Exhibit "A" to the Zenger Declaration, the Ragasa Declaration, the Emura

Declaration and the Hookano Declaration clearly shown that the custom of the

COUNTY is to ignore USLA training certification requirements and thereby

endanger public safety.  Moreover, the COUNTY was well aware of KADEN's,

SPROAT's and KINI's criminal activities, yet did nothing about it.  The

COUNTY was equally aware that SPROAT and KADEN wrongfully terminated

WSO Hookano and suspended WSO Supervisor Emura in January 2002, but did

nothing about it.   The facts of this case, when viewed in the light most favorable

to Plaintiffs , show that there is a causal relationship between the COUNTY's

"policy" and the many wrongs suffered by CARL at the hands of KADEN,

SPROAT and KINI between February 2001 and March 2002 and as recently as

May 2005.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

**D.    PLAINTIFFS HAVE PRESENTED OVERWHELMING
EVIDENCE THAT SPROAT, KADEN AND KINI ENGAGED
IN A CONSPIRACY AGAINST CARL**

Given the facts of the case as presented in Exhibits "A" through "I" of the

Zenger Declaration and those contained in the declarations of Terry Chung Myles Emura, Nathan Hookano, Norman Hunter, Gerald Hurd, Mark McKamey, Bruce Stine, Clay Wolcott, CARL himself must be accepted as true and the inferences drawn in Plaintiffs 's favor, there can no longer be any serious claim that there is no evidence of a conspiracy in this case.

**E.    PLAINTIFFS HAVE PROVIDED EVIDENCE TO SHOW THAT THE COUNTY AND KFD KNEW OF ANY ALLEGED WRONG ACTS OR CONDONED A CONSPIRACY TO ENGINEER A FALSE ARREST**

Again, given the facts of the case as presented in Exhibits "A" through "I" of the Zenger Declaration and those contained in the declarations of Terry Chung Myles Emura, Nathan Hookano, Norman Hunter, Gerald Hurd, Mark McKamey, Bruce Stine, Clay Wolcott and CARL himself, there exists sufficient evidence showing that the County and KFD knew of and condoned wrongful acts against CARL.

**F.    PLAINTIFFS' CLAIMS FOR NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ARE NOT BARRED BY THE WORKERS' COMPENSATION EXCLUSIVITY STATUTE.**

It is well established under Hawai'i law that the Hawai'i Workers' Compensation law does not apply to co-workers that are alleged to have committed reckless or intentional acts against another co-worker. As the Hawaii

23

Supreme Court stated in <u>Iddings v Mee-Lee</u>, 919 P. 2d 263 (Hawaii, 1996) .

"Permitting an injured worker to bring an action against a co-employee for an intentional tort places responsibility upon the tortfeasor where it belongs.  Since the commission of an intentional tort includes a constructive or actual intent to injure, allowing an injured co-worker to sue the tortfeasor serves as a deterrent against future misconduct.  *By allowing wanton negligence to support awards of punitive damages, we have recognized that such conduct can be deterred* and should be treated as an intentional tort.  Therefore we hold that the Worker's Compensation Act does not shield a co-employee from liability for injury caused by his [or her] willful, wanton and reckless negligence." "We therefore hold that allowing suits between co-employees based upon reckless conduct does not contravene or impair the purposes of Hawaii's workers' compensation scheme."  .

## G.    PLAINTIFFS' HAVE A BASIS TO CLAIM ENTITLEMENT TO PUNITIVE DAMAGES

The COUNTY thinks this case is only about what it says happened on March 20, 2002, March 21, 2002 and March 2003.  The COUNTY is wrong.  This case is about the intentional, malicious torts that KADEN, SPROAT and KINI committed together, separately and in concert with each other from February 2001 to March 2002.  Moreover, recent false, unfounded claims of theft, substance abuse and alcoholism leveled at CARL by the COUNTY and KFD show that the I institutional aspects of the conspiracy against CARL are not yet finished.  (Please see Ragasa Declaration at Paragraphs 131 through 138.

Again, Exhibits "A" through "I" of the Zenger Declaration and the facts set

24



forth in the declarations of Terry Chung Myles Emura, Nathan Hookano, Norman Hunter, Gerald Hurd, Mark McKamey, Bruce Stine, Clay Wolcott and CARL show otherwise, especially when viewed in the light most favorable to the non-moving party.

When viewed in that light, cases cited by the COUNTY on punitive damages, like <u>Masaki v. Gen. Motors Corp.</u>, 71 Haw. 1, 780 P.2d 566, (Haw. 1989), have no bearing on or relevance to this case.

## H.   PLAINTIFFS HAVE MET THE ELEMENTS OF FALSE IMPRISONMENT

Given the evidence presented by Plaintiffs in their opposition to their the Motions for Summary Judgment, it is clear that they have in fact established the *unlawfulness* element of CARL's imprisonment contested by the COUNTY.

## I.   PLAINTIFFS HAVE MET THE ELEMENTS OF PROOF OF DEFAMATION

The evidence, when viewed in the light most favorable to Plaintiffs, shows that the statements that KINI and SAGE made concerning CARL to the police were defamatory.  No privilege exists anywhere for anyone, public official or not, to conduct themselves that way that the defendants in this case have.  None of the

cases or authorities cited by the COUNTY in this regard, (Beamer v. Nishiki, 670 P.2d 1264, 1271 (Haw. 1983) or *the* RESTATEMENT (SECOND) OF TORTS § 558 (1977) have anything to do with organized, conspirational activities designed to have a person falsely arrested.

### J.    PLAINTIFFS HAVE MET THE ELEMENTS OF PROOF OF MALICIOUS PROSECUTION

With respect to the Plaintiffs' malicious prosecution claim, Defendants do dispute that the first of the three elements of the malicious prosecution of the Criminal Case were have been satisfied.  All agree that the Criminal Case initiated by KINI and SAGE against CARL on March 27, 2002 were terminated in CARL's favor.

Based upon any one of the Sage Conspiracy Admissions Exhibits, the trier of fact could easily find that SAGE lied to the police on March 27, 2002 about what happened on March 20, 2002 and March 22, 2002 and that CARL committed no crimes against him.  Likewise, the trier of fact could easily find that KINI lied to the police on March 27, 2002 about what happened on March 20, 2002, March 21, 2002 and March 22, 2002 and that CARL committed no crimes against him.

If SAGE and KINI lied to the police on March 27, 2002 knowing full well that CARL had committed no crimes against them, then it is axiomatic that they

brought the proceedings against CARL without probable cause and that they initiated the proceedings with malice.

The rest of the evidence in the Plaintiff' opposition documents serve to show **why** SAGE and KINI lied to the police on March 27, 2002. The opposing documents, when viewed in the light most favorable to Plaintiffs, prove the existence of and membership in the underlying Section 1983 Conspiracy as well as its scope and purpose: to get CARL terminated from the COUNTY by any means necessary.

In any event, the evidence, when viewed in the light to Plaintiffs , show that the have clearly met the test set forth in <u>Myers v. Cohen,</u> 67 Haw. 389, 396, 688 P.2d 1145, 1151 (1984), the COUNTY's arguments notwithstanding. (See also Exhibit "I" of the Zenger Declaration, the deposition of Michael Soong , Esq. taken on November 8, 2005 at pages 15 through 23).

## V.    **CONCLUSION**

For the reason stated herein, Plaintiffs respectfully request that the Motion for Summary Judgment be denied as to all counts and all claims.

27

DATED:   Lihue, Kauai, Hawaii, January 6, 2006.

MARK R. ZENGER
DONNA E. RICHARDS
Attorneys for Plaintiffs
CARL RAGASA and KANANI RAGASA

---

**PLAINTIFFS CARL RAGASA AND KANANI RAGASA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS COUNTY OF KAUAI, KAUAI FIRE DEPARTMENT, DAVID SPROAT,  ROBERT KADEN AND SIDNEY KINI'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I - IX OF PLAINTIFFS CARL RAGASA AND KANANI RAGASA'S COMPLAINT FILED ON OCTOBER 3, 2003 (VIOLATION OF 42 U.S.C. §1983, CIVIL RIGHTS VIOLATION); Carl Ragasa and Kanani Ragasa v. County of Kauai, et. al, United States District Court, District of Hawaii, CIVIL NO. CV03  00540SPK-BMK.**

---

28