IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CARL RAGASA and KANANI RAGASA, | ) CIVIL NO. 03-00540 |
| | ) |
| Plaintiffs, | ) **DECLARATION OF CARL RAGASA** |
| | ) |
| vs. | ) |
| | ) |
| COUNTY OF KAUAI, KAUAI FIRE DEPARTMENT, DAVID SPROAT, ROBERT KADEN, SIDNEY KINI and ETHAN SAGE, | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF CARL RAGASA

I, CARL RAGASA, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I have been a Water Safety Officer with Defendant COUNTY OF KAUAI ("COUNTY") since about 1991.

2.  I have been married to KANANI since December 2001.

3.  I consider myself to be the best Water Safety Officer in the County and one of the finest big wave surfers and watermen in the world.

1

4.    Ever since I started working for the COUNTY, when the waves are the biggest and the situation is the heaviest and most dangerous, all of the other Water Safety Officers, call on and expect me  to be the one to take control and care of the situation.

5.    The waves on the North Shore of Kauai are some of the biggest and most powerful in the world.  During the wintertime, especially the months of November through March, it is no place for amateur surfers or swimmers to be.  Open water rescues are often extremely difficult and dangerous and require a high level of skill, conditioning, training, knowledge and experience.

6.    I have a clean personnel file and record at work.  I do not now nor have I ever had any sustained oral or written reprimand of any kind, nor any disciplinary action of any kind from anyone, save for the COUNTY and the Kauai Fire Department ("KFD) having forced me to take leave in May 2005 on false and retaliatory pretenses, as shall be more fully discussed hereinbelow.

2

7.  In March of 2000, then County of Kauai Mayor Mary Anne Kusaka decided to transfer all Water Safety Officers from the Parks and Recreation Department to KFD, but delayed the actual transfer until July 2000.

8.  In July 2000, Defendant DAVID SPROAT ("SPROAT"), was the Chief of KFD.

9.  In January 2001 SPROAT placed command and control of all of the thirty (30) or so Water Safety Officers on Kauai under Defendant ROBERT KADEN ("KADEN").  By that time, WSO II Mark McKamey and I had been the senior guards on the North Shore for several years.  He and I were solely responsible for all operations, assignments and training for all of the North Shore WSOs.  He and I were both permanently assigned to Tower 1 fronting the beach at the Hanalei Pavilion.  That is where most of the big surf rescues take place.

10. I did not know KADEN very well at that time, but had seen him in action in the open ocean. From having watched him surf, I knew that he was afraid of big waves and does not know what he is doing in large

3

surf.

11. During February 2001, there was an extremely large swell that hit the North Shore. The ocean conditions were very hazardous and dangerous.

12. During that swell, KADEN interfered with the way that WSO II Mark McKamey and I were deploying personnel. He was issuing nonsensical orders from the comfort of his office in Lihue, 40 miles away from danger. Simply put, he was interfering with the safety of the public and the water safety officers that work with me. Something had to be done.

13. A few days later, I confronted KADEN at Tower 1. I told him that he does not know what he is doing and that he is endangering lives. I told him that he cannot "call shots" 40 miles from the scene of danger and that we, unlike him, had years of experience dealing with the treacherous surf conditions. I told him it would be better if WSO McKamey and I handle situations involving heavy surf, as we had done in the past. KADEN got angry and stomped off. After that, I had no respect for KADEN. I thought that he was bad

4

for the Water Safety Program and public safety in general.  I shared my thoughts and feelings about him to a few of my friends and relatives.  One of them was Terry Chung.

14.  Back in 2001, there was a hair cutting salon in Kapaa, Kauai called "Shaka Shears."

15.  Shaka Shears was owned by a woman named Judy Darling.

16.  Judy Darling's brother, Jamie, worked for Darling as a hair stylist at Shaka Shears.

17.  Jamie was a friend of a person named Dana Crimble.

18.  I have known Terry Chung for many years.  He is a valued and trusted friend of mine.

19.  In or about mid-2001, Terry Chung told me that:

A.   he had a friend named Dana Crimble;

B.   Dana Crimble was friends with Jamie Darling; and

C.   Jamie had just quit working at Shaka Shears because he had recently witnessed KADEN deliver heroin to Judy Darling and

5

Judy Darling pay KADEN for the heroin at
Shaka Shears.

20. In or about January 2002, KADEN called Terry
Chung on the telephone. KADEN asked him to tell me to
stop spreading rumors that KADEN was a heroin dealer.
Terry Chung told KADEN that he knew that he was in fact
a heroin dealer and that he, Terry Chung, was the last
person that KADEN should call to ask me to stop saying
it to others in light of the fact that he, Terry Chung,
was the person that told me that KADEN was a heroin
dealer in the first place.

21. Once I learned that KADEN was involved in
heroin trafficking, I wanted nothing to do with him.
As far as I was concerned, the less contact that I had
with KADEN, the better.

22. In or about June 2001, WSO Supervisor Myles
Emura was promoted from being a Water Safety Officer to
being a Water Safety Officer Supervisor, replacing
Water Safety Officer III Supervisor Randy Ortiz.

23. When WSO Supervisor Emura was promoted, there
was one other Water Safety Officer III Supervisor, that

6

being Kaleo Hookano. WSO Supervisors Hookano and Emura were supervising about thirty (30) Water Safety Officers employed by the COUNTY.

24. In the summer of 2001 I learned from WSO Supervisor Hookano that SPROAT and KADEN wanted to place him, WSO Supervisor Emura and the other Water Safety Officers under the direct command and control of Defendant SIDNEY KINI (hereinafter "KINI").

25. From WSO Supervisor Hookano, I learned that KINI had been a Water Safety Officer with the COUNTY since before 1984.

26. In the summer of 2001, WSO Supervisor Hookano told me that:

    A.  when KINI and WSO Supervisor Hookano were Water Safety Officers together, the Water Safety Program was run by the COUNTY's Parks and Recreation Department; and

    B.  KINI always said that he was not happy being a Water Safety Officer because there was no future in it and no opportunity for advancement; and

7

C.  when KINI was a Water Safety Officer, he always told WSO Supervisor Hookano that he wanted to be a fire fighter with the County because there was a future in it and there were good opportunities for advancement; and

D.  when KINI was a Water Safety Officer, he always told WSO Supervisor Hookano that he would do anything to be a fire fighter with the County; and

E.  while KINI was a Water Safety Officer, he told WSO Supervisor Hookano many times that he had taken the test to be a fire fighter with the County on at least three (3) separate occasions, but that he failed each time; and

F.  while KINI was a Water Safety Officer, he told WSO Supervisor Hookano that he formed a close relationship with KADEN, who was a County fire fighter at the time; and

G.  KINI had formed a close relationship with

8

KADEN in the late 1980's; and

H.  in or about 1989, KINI told him that KADEN was going to see to it that KINI got hired as a firefighter; and

I.  The next year, 1990, KINI did become a firefighter with the COUNTY; and

J.  shortly after KINI became a firefighter, he told WSO Supervisor Hookano that he owed KADEN a lot; and

K.  KINI was never a very good Water Safety Officer and that KINI only worked on the southwest side of Kauai, where the waves are small most of the year and where the waves never get nearly as big as they do on the North Shore of Kauai; and

L.  that KINI never did any rescues on the North Shore and that KINI was afraid of the North Shore, especially in the winter time when the waves are big; and

M.  KINI has never surfed in big waves and that he is afraid of big waves.

9

27. By the summer of 2001, I had watched KINI surf many times. It is clear to me that he is in fact afraid of big waves and that he does not know what to do when the surf is big and someone is in trouble.

28. In the summer of 2001, WSO Supervisor Hookano also told me that:

A.   the Red Cross never trained or certified anybody in open ocean lifesaving; and

B.   the Red Cross training is only for certifying lifeguards that work in swimming pools or lakes, not the open ocean; and

C.   While KINI was a Water Safety Officer, he was never certified by any entity in open ocean lifesaving; and

E.   KINI became a firefighter in or about 1990; and

F.   WSO Supervisor Hookano had attained the rank of Water Safety Officer II in 1996 and was supervising all of the Water Safety Officers within the County Parks

10

and Recreation Department; and

G.   Two years after KINI quit as a Water
     Safety Officer and became a fire fighter,
     an entity called the United States
     Lifesaving Association ("USLA") started
     its Lifeguard Agency Certification
     Program; and

H.   USLA replaced the Red Cross as the
     certifying agency for Water Safety
     Officers on Kauai; and

I.   In 1998, many years after KINI had quit
     being a Water Safety Officer, WSO
     Supervisor Hookano obtained the Lifeguard
     Agency Certification Program from USLA;
     and

J.   As a certified USLA instructor in good
     standing with USLA, WSO Supervisor Hookano
     is very familiar with the USLA Guidelines
     and certification procedures and
     requirements; and

K.   that the USLA Guidelines require, among

11

other things, a minimum cumulative total of 1,000 hours of employment compiled in no fewer than three seasons as a seasonal open ocean lifeguard that to qualify for certification as an open ocean USLA instructor; and

L.   That as of the summer of 2001, there was no possible way that KINI could be qualified as an open ocean USLA instructor.

29. Based upon my observations and knowledge of KINI, who was a fire fighter, and facts about KINI's background that I learned from WSO Supervisor Hookano, I publicly and often objected to KADEN and SPROAT having KINI involved with the Water Safety Program in any way, shape or form.  I thought that KINI, like KADEN was bad for the Water Safety Program and public safety in general.  I shared my thoughts and feelings about KINI with others in the Water Safety Program.

30. After KFD, SPROAT and KADEN took over the command and control of the COUNTY Water Safety Program,

12

they started holding Water Safety WSO Supervisor Emura
meetings on a regular basis (the "KFD Water Safety
Program Meetings").

31.  WSO Supervisor Emura and WSO Supervisor Hookano
attended the KFD Water Safety Program meetings with
SPROAT and KADEN on a regular basis.

32.  In the summer of 2001, WSO Supervisor Emura
and WSO Supervisor Hookano told me that during the KFD
Water Safety Program meetings and at other times during
the summer months of 2001, KADEN told them many times
that he was having problems with me and that he really
wanted to fire me.

33.  During the summer of 2001, KADEN filed at least
one fraudulent reprimand against me that I know of.

34.  During the summer of 2001, KADEN attempted on
several occasions to get WSO Supervisor Emura
reprimanded on false and bogus allegations that I was
supposedly leaving my post at the Tower 1 Pavilion
without authorization.  I beat KADEN's attempted
reprimand efforts every single time for the simple
reason that I was doing nothing wrong.

35. During the summer of 2001, WSO Supervisor Emura and WSO Supervisor Hookano told me several times to watch out for KADEN and SRPOAT because they were trying to "set me up" so they could terminate me.

36. During the summer of 2001, I supported WSO Supervisor Emura and WSO Supervisor Hookano fully in their efforts to dissuade SPROAT and KADEN from appointing KINI to take over command and control of all of the Water Safety Officers on Kauai.

37. At all times, WSO Supervisor Hookano and WSO Supervisor Emura told me that they were having heated arguments with SPROAT and KADEN about KINI being appointed to take over command and control of all of the Water Safety Officers on Kauai.

38. I told WSO Supervisor Hookano and WSO Supervisor Emura that I fully agreed with their assessment that KINI was not qualified to take over command and control of all of the Water Safety Officers on Kauai. I told WSO Supervisor Hookano and WSO Supervisor Emura that I would help them to stop KINI from being involved in the Water Safety Program in any

14

way that I could.

39. WSO Supervisor Hookano and WSO Supervisor Emura both told me that during the KFD Water Safety Program Meetings, they both told KADEN and SPROAT that I was on their side with respect to KINI not being qualified to take over training and command and control of all of the Water Safety Officers on Kauai.

40. WSO Supervisor Hookano and WSO Supervisor Emura both told me during the summer of 2001 that KADEN and SPROAT claimed that they were abandoning their plans to have KINI take over command and control of all of the Water Safety Officers on Kauai. I did not believe that KADEN and SPROAT would cease in their efforts to appoint KINI, and told WSO Supervisor Emura and WSO Supervisor Hookano that. It was my firmly held belief then that KADEN and SPROAT would keep trying to get KINI in no matter what because he was "their boy."

41. During the summer of 2001, KADEN came to Tower 1 while I was working. There, he told me that he wanted to deliver a letter that falsely accused me of violating standard operating procedures. I would not

take it.  KADEN became angry, confrontational and combative, as if he were trying to incite me to hit him.  I knew from my earlier conversations with WSO Supervisor Emura and WSO Supervisor Hookano that he was trying to get me to hit him so he could terminate me and I did not "take the bait."

42.  I have never been violent toward anyone or threatened anyone with violence in any way, shape or form.

43.  I am, however, an accomplished martial artist.

44.  Outside of participating in formal martial arts competition, I have never committed violence toward others or threatened others with violence.

45.  By the fall of 2001, WSO Supervisor Emura and WSO Supervisor Hookano both told me that they had formed the belief that SPROAT and KADEN were lying to them about a lot of matters that touched and concerned the Water Safety Program and that they had started an internal investigation of KADEN and SPROAT into their activities at KFD and the COUNTY.

46.  WSO Supervisor Emura and WSO Supervisor Hookano

16

both told me that they had facts in their possession that proved that SPROAT had committed the crimes of assault and battery, illegal conversion of County resources, money laundering and theft.

47. WSO Supervisor Emura and WSO Supervisor Hookano both told me that they had facts in their possession that proved that KADEN had committed the crimes of money laundering. WSO Emura also told me that he learned that KADEN was also using illegal drugs and trafficking heroin.

48. WSO Supervisor Emura and WSO Supervisor Hookano both told me that they had facts in their possession that proved that KINI, along with KADEN and SPROAT, had committed the crimes of illegal conversion of County resources and money laundering.

49. Between the fall of 2001 and early 2002 WSO Supervisor Emura and WSO Supervisor Hookano told me that they had reported to the Mayor of Kauai, many members of the County Council and other KFD Battalion Chiefs and supervisors on many occasions that SPROAT had committed the crimes of assault and battery,

17

illegal conversion of County resources, money laundering and theft and told them the details of his wrongdoing in that regard.

50. Between the fall of 2001 and early 2002 WSO Supervisor Emura and WSO Supervisor Hookano told me that they had reported to the Mayor of Kauai, many members of the County Council and other KFD Battalion Chiefs and supervisors that KADEN had committed the crimes of money laundering, illegal drug use and illegal drug trafficking and told them the details of his wrongdoing in that regard.

51. Between the fall of 2001 and early 2002 WSO Supervisor Emura and WSO Supervisor Hookano told me that they had reported to the Mayor of Kauai, many members of the County Council and other KFD Battalion Chiefs and supervisors that KINI had committed the crimes of illegal conversion of County resources and money laundering and told them the details of his wrongdoing in that regard.

52. On or about January 2, 2002, SPROAT and KADEN terminated WSO Supervisor Hookano from his position as

18

a Water Safety Officer III Supervisor and COUNTY employee.

53. On or about January 2, 2002, SPROAT and KADEN suspended WSO Supervisor Emura without pay from his position as a Water Safety Officer III Supervisor and COUNTY employee.

54. WSO Supervisor Hookano and WSO Supervisor Emura told me that SPROAT and KADEN had "gotten rid" of them because they were reporting SPROAT's, KADEN's and KINI's criminal activities to the Mayor of Kauai, many members of the County Council, other Battalion Chiefs and supervisors in KFD, and because they opposed KADEN from being involved in the Water Safety Program and because they did not want KFD to be involved in water safety training.

55. By the time that SPROAT and KADEN got rid of WSO Supervisor Hookano and WSO Supervisor Emura, the policies of SPROAT and KADEN had caused the work conditions and mission readiness of all Waters Safety Officers on Kauai to greatly decline and at the same time seriously compromise public safety for Kauai's

beachgoers.

56.  At the time that SPROAT and KADEN got rid of WSO Supervisor Hookano and WSO Supervisor Emura, WSO Supervisor Hookano and WSO Supervisor Emura told me to watch out for SPROAT and KADEN because the would both be out to get rid of me, too, from the Water Safety Program.  I believed them because I knew from WSO Supervisor Emura and WSO Supervisor Hookano all about SPROAT's, KADEN's and KINI's criminal activities and the fact that WSO Supervisor Emura and WSO Supervisor Hookano disclosed those activities to the Mayor of Kauai, many members of the County Council, other Battalion Chiefs and supervisors in KFD, and because I, too, opposed KINI and KADEN from being involved in the Water Safety Program and did not want KFD to be involved in water safety training.

57. Within a month of KADEN and SPROAT having gotten rid on WSO Supervisor Hookano and WSO Supervisor Emura, KADEN and SPROAT assigned to take over all open ocean training of the Water Safety Officers.

58. WSO Norman Hunter has been a Water Safety Officer with the COUNTY since 1991. I have known WSO Hunter all since that time.

59. In January 2002, WSO Hunter was an acting Supervisor for the Water Safety Program. WSO Hunter worked closely with KADEN during that time.

60. In late January or early February 2002, WSO Hunter told me that on at least four (4) separate occasions during January 2002 alone, he heard KADEN say "F— CARL! I'm going to get him fired!"

61. In late January or early February 2002, WSO Hunter told me that heard KADEN and SPROAT making plans to:

A. write a letter to me designed to make me angry and commit assault upon KADEN;

B. have KADEN deliver the letter to me at Tower 1;

C. have KADEN wear an electronic recording device in order to record the assault that SPROAT and KADEN hoped I would commit when the letter was delivered.

62. Defendant ETHAN SAGE ("SAGE") has been a Water

21

Safety Officer with the COUNTY since about 1999. I
have known SAGE ever since he started working with the
COUNTY.

63. Shortly after SPROAT placed command and
control of all of the thirty (30) Water Safety Officers
on Kauai under KADEN, SAGE began acting in a very
unprofessional manner.

64. Starting in 2001, I saw SAGE regularly come to
work at his assigned tower late.

65. Starting in 2001, I saw SAGE leave his
assigned tower without permission from any of the
Senior Water Safety Officers or any of the Water Safety
Officer Supervisors on many occasions.

66. Starting in 2001, I saw SAGE many times leave
COUNTY lifesaving equipment out overnight at the tower
he had been working at.

67. Starting in 2001, I saw SAGE surfing on days
when he had called in sick and was supposed to be
manning an assigned tower.

67. In 2001, I found SAGE's marijuana in the COUNTY
lifeguard while he was on duty.

69. Starting in 2001, I saw SAGE fail and refuse to obey direct orders issued to him by me and other Senior Water Safety Officers and Water Safety Officer Supervisors.

70. During the year 2001, I had several discussions with other Water Safety Officers that are assigned to the North Shore of Kauai about SAGE and his lateness at arriving to work, leaving his tower without permission, leaving lifesaving equipment out overnight, smoking marijuana while on duty, failure and refusal to obey direct orders, and calling in sick to work when he is surfing right in front of us.

71. The Water Safety Officers that I spoke to about SAGES' misconduct and unprofessional behavior in 2001 were Clay Wolcott, who was then and is now one of two Senior Water Safety Officers assigned to the North Shore and WSO II McKamey, who was then and is the other of Senior Water Safety Officers assigned to the North Shore, Chris Pico, Gavin Kennelly, Gerald Hurd and Bruce Stine.

72. In addition to the Water Safety Officers

23

referenced above, I regularly made complaints about SAGE to WSO Supervisors Hookano and Emura.

73. Over the course of the year 2001, I became increasingly disturbed and frustrated over SAGE's misconduct and unprofessional behavior. SAGE was endangering the lives of the beach going public, the other Water Safety Officers that he was assigned to work with and me. Despite the fact that I had been complaining and discussing these matters with other Water Safety Officers and WSO Supervisors Hookano and Emura, no action was being taken to correct the situation with SAGE.

74. By early 2002, it was clear to me that SAGE presented a clear and present danger to the lives of the beach going public on Kauai, the other Water Safety Officers that he is assigned to work with and me. I told SAGE so on more than one occasion.

75. In February 2002, KINI, acting under orders from the COUNTY, SPROAT and KADEN, appeared at Kauai County Lifeguard Tower No. 1 in Hanalei. While there, the following events occurred:

24

A.    KINI told me that he was going to train all of the water safety officers, including those on the North Shore, in USLA certified open water lifesaving procedures; and

B.    I demanded that KINI display to me his USLA certification card to prove that he was legally certified by USLA in open water lifesaving procedures; and

C.    KINI failed and refused to display to me a USLA certification card; and

D.    based upon KINI's failure and refusal to show me a USLA certification card and prove that he was in fact legally certified to train others in that regard, I refused to allow KINI to train me.

76.    A few days later in February 2002, KINI, acting under orders from the COUNTY, SPROAT and KADEN, appeared at Kauai County Lifeguard Tower No. 1 in Hanalei again.  While there, the following events occurred:

A.    KINI again told me that he was going

25

to train the all of the water safety officers, including those on the North Shore, in USLA certified open water lifesaving procedures;

B.    I again demanded that KINI display to me his USLA certification card to prove that he was legally certified by USLA in open water lifesaving procedures; and

C.    KINI again failed and refused to display to me a USLA certification card;

D.    based upon KINI's continued failure and refusal to show me a USLA certification card and prove that he was in fact legally certified to train others in that regard, I again refused to allow KINI to train me.

77.    I knew from having spoken with WSO Supervisor Hookano that KINI was not USLA certified and that there was no way that he could be.

78.    In February 2002, I began telling all of the WSOs that I spoke to that they should not allow KINI to train them in open water lifesaving procedures because he was nothing more than a fireman who did not know

26

what he was doing and was not licensed or qualified to instruct them.

79. On Wednesday, March 20, 2002, KINI held a USLA open water training class at the Hanalei Pier. WSO Gerald Hurd was one of those in attendance.

80. Later that day, KINI moved the USLA open water training class from the Hanalei Pier to Tower #1.

81. Most of the Water Safety Officers in KINI's class walked from Hanalei Pier to Tower 1. SAGE and WSO Gerald Hurd were among them.

82. As SAGE and the others walked along the beach from the Hanalei Pier to Tower 1, Water Safety Officer Mark McKamey and I were working at Tower 1. We were watching a woman in the rip current. She was not far from shore and not in danger.

83. As Mark McKamey and I were watching the woman, I saw and heard SAGE making derogatory comments about Mark McKamey and I in a loud voice. SAGE said, "look at the senior guards. They don't know how to do their jobs!"

84. When I heard SAGE say "look at the senior

27

guards. They don't know how to do their jobs,!" I
said to SAGE "get the f*** out of here. Don't tell us
how to do our jobs."

85. KINI's USLA open water lifesaving class
finished up behind Tower 1 near the storeroom area.
Nothing else out of the ordinary ever occurred.

86. At no time on March 20, 2002 did I ever raise
my voice or say any threatening words toward KINI or
SAGE in any way. All I ever said the whole time to
SAGE was "get the f*** out of here. Don't tell us how
to do our jobs."

87. At about 4 o'clock that afternoon, when the
class was over, WSO McKamey and I both talked to KINI
at the bottom of the steps by Tower 1 about the many
problems that WSO McKamey and I had with SAGE in the
past. WSO McKamey did most of the talking. WSO
McKamey told KINI that most of his and my problems with
SAGE were the direct result of his many unprofessional
acts and behavior.

88. KINI seemed to be listening to WSO McKamey.
KINI told us that his plan was to hold helicopter

28

training for class at Salt Pond the next day and that
he planned on returning to Tower #1 on Friday, March
22, 2002 for rescue board and Jet Ski training.

89. WSO McKamey told KINI that we both thought that
bringing SAGE back to Tower 1 was a bad idea.  SAGE
seemed to be wanting to start trouble with WSO McKamey
and I.  WSO McKamey and I wanted to avoid a
confrontation.  We therefore suggested to KINI that he
hold the next USLA open water training class at Tower
#2, where the surf conditions would be more suitable
for rescue board and Jet Ski training.  KINI told us
that he would do so but we still did not trust him and
suspected that he was up to something.

90. The next day, March 21, 2002, I called KINI on
the telephone while he was with KADEN at Salt Pond
training other water safety officers.  The only thing
of substance that I said to KINI during that telephone
conversation was that I asked him not to hold the open
ocean training at Tower 1, and I did so in an adamant
but polite and courteous tone of voice and manner.

91. KINI replied, "I'll think about it."

29

92. I made the telephone call from Terry Chung's house. He was standing right next to me the whole time and heard every word I said.

93. On the morning of Friday, March 22, 2002, I was at the Hanelei Pavilion at about 8:00 a.m.

94. I was walking out of the men's bathroom tying my surf shorts. WSO Hurd joined me and we walked together to the Tower 1 storeroom.

95. As WSO Hurd and I approached the storeroom, SAGE walked towards us and stopped just a few feet away from WSO Hurd and I.

96. As SAGE approached WSO Hurd and me, I said to SAGE, "Good morning, diaper boy."

97. SAGE responded to me by saying, "CARL, why the f*** do you have to be so negative all the time."

98. Right after SAGE said that to me, I merely kept walking past SAGE and said nothing.

99. At that point, KINI approached the area where WSO Hurd and I were. We were the only ones there. Everyone else was too far away to hear the conversation. I said to KINI, "We told you Sid, don't

bring him around here. Why did you bring him over here?

100.    KINI did not respond to me and I immediately left the area for my morning run up and down the beach without further discussion or incident with anyone.

101. At no time on March 22, 2002 did I ever raise my voice, swear at, or say any threatening words toward KINI or SAGE in any way. WSO Hurd was with me the whole time.

102. On Easter Sunday, March 31, 2002, Officer Gerald Kim of the Kauai Police Department arrested me while I was on duty for the COUNTY and KFD t Tower 1. Officer Kim put me in a marked vehicle and drove me to the station.

103. Once there I was fingerprinted, photographed, booked and detained me at the station and charged me with crimes.

104. I was shocked. I had done nothing wrong. Right away, I knew that KADEN and SPROAT were somehow behind my bogus arrest.

31

105. In April 2002, WSO Hunter told me that:

A.   On March 27, 2002, KADEN and WSO Hunter
     picked up SAGE in a COUNTY vehicle while
     he was at work at Tower 9 to take him to
     the KPD;

B.   SAGE told WSO Hunter and KADEN that he did
     not want to go, but KADEN told SAGE that
     he would be fired if he did not do what
     KADEN wanted; and

C.   WSO Hunter did not want to go pick up SAGE
     or be involved, but KADEN told WSO Hunter
     that WSO Hunter would be fired for
     insubordination if WSO Hunter refused to
     go along with him.

106. Starting in April 2002, WSO Hunter has
told me several times that after March 27, 2002 and the
date herein, SAGE has told WSO Hunter on at least ten
(10) separate occasions that:

A.   while at KPD, he made several false statements
     to KPD, with KINI by his side and KADEN over
     his shoulder, about what had happened at Tower

32

1 on March 20 and March 22, 2002 among him, KINI and me;

B.   He made the false statements about me to KPD because KADEN and SPROAT were intimidating him and pressuring him into doing so; and

C.   KADEN and SPROAT had told him on many occasions that if he did not falsely implicate me as having committed crimes against him and KINI on March 20, 2002 and March 22, 2002, then KADEN, and SPROAT would have him fired.

107.   In May 2002, the Office of the Prosecuting Attorney for the County of Kauai, acting in direct reliance on the false reports that KINI and SAGE made to members of the Kauai Police Department on March 27, 2002, issued a formal criminal complaint against me in May 2002, said complaint being designated as Criminal No. HC-02-287 in the District Court of the Hanalei Division, State of Hawaii (hereinafter referred to as the "Criminal Complaint").

108.   The Criminal Complaint charged me with having committed two (2) counts of criminal harassment, in

violation of Hawaii Revised Statutes Section 711-1106 (hereinafter referred to as the "Criminal Harassment Charges").

109.    The Criminal Harassment Charges are petty misdemeanors.  They are punishable by sixty (60) days in prison and a $2,000.00 fine.

110.    In early June 2002, SAGE approached me with WSO Hunter.  He told that me that he felt very bad because he had conspired with and been used by KADEN and SPROAT as part of a scheme to get me fired as a Water Safety Officer.

111.    SAGE told me that:

A.    On March 27, 2002 KADEN took him to the Lihue Police Station against his will: and

B.    When he and KADEN got to the Lihue Police Station, KINI was already there in the parking lot: and

C.    While in the parking lot, KADEN and KINI were fabricating lies about what I had done and said to them on March 20, 2002 and March 22, 2002 because they wanted to

34

get me fired from my job as a Water Safety
Officer; and

D.  KADEN and KINI told him that he and KINI
had to get their stories straight or the
police officer might not believe their
lies about me; and

E.  After a while, KADEN and KINI escorted him
into the police station; and

F.  Once inside, the three of them stayed
together while a police officer
interviewed he and KINI at the same time;
and

G.  The whole time that he was being
interviewed, KADEN stood directly over him
in an intimidating manner: and

H.  He told the police officer the lies about
that KINI and KADEN told him to say when
the three of them had earlier met in the
parking lot; and

I.  He told the police officer that I was
threatening him with bodily injury and

35

swearing at him and KINI on March 20 and
March 22, 2002 when in fact I had not done
so; and

J.    He lied to the police officer only because
SPROAT and KADEN, to a larger extent and
KINI to a lesser extent had for several
months exerted pressure on him to help
them get me fired from my job or they
would see to it that he would be fired
from his.

112.  SAGE then asked me what he could do to help
right the wrong he, SPROAT, KADEN and KINI had done to
me by making a false police report against me.  I asked
him to put what he told WSO Hunter and I in writing.
He did so on three separate occasions and gave the
statements to me.  I turned them over to Attorney
Zenger.

113.  SAGE then approached me and asked if he could
help me anymore to right his wrongs against me.  I told
him that he could make a taped statement.  He did so in
front of me and several witnesses, including one of my

36

attorneys, Mark R. Zenger, on October 4, 2002.

114. During the October 4, 2002 taped statement, SAGE repeated what he said in Exhibit "A" and what he had earlier told WSO Hunter and I.

115. The Honorable Trudy K. Senda of the Hanalei Division of the District Court for the Fifth Circuit of the State of Hawaii dismissed the Criminal Harassment Charges against me with prejudice in November 2002. The charges were preposterous, falsified and "trumped up." I had done nothing wrong to KINI or SAGE nor committed any crime against them on March 22, 2002 or any other time. It was the other way around. KANANI and I were and still are the victims of their crimes.

116. At no time did I ever threaten SAGE in any way, shape or form to make any statement, oral or written, about what happened between he, KINI and I on March 20, 2002 or March 22, 2002.

117. At no time did I ever ask or tell anyone else to threaten SAGE in any way, shape or form to make any statement, oral or written, about what happened between he, KINI and I on March 20, 2002 or March 22,

2002.

118. I have known WSO Bruce Stine for a long time. He is a big-wave surfer and an accomplished waterman. WSO Stine has been a Water Safety Officer since late 2001. I was very happy to be working with him as he has long had the ability to handle himself in even the largest, most treacherous big wave conditions.

119. Late last year, WSO Stine told me that he owed me an apology because he had allowed himself to be used by KADEN and SPROAT as part of a fraudulent scheme to get me fired as a Water Safety Officer.

120. WSO Stine told me that starting in the late 1990's he had unsuccessfully applied several times for the position of Water Safety Officer with the COUNTY and that working on the North Shore as a lifeguard had long been one of his main goals in life.

121. WSO Stine told me that in the Spring of 2001, he helped KADEN with an open water rescue to Lumahai Beach.

122. WSO Stine also told me that KADEN said that he was having problems with me being the head Water

38

Safety Officer at Tower 1 and that he really needed to and wanted to fire me.

123. WSO Stine also told me that over the next several months, he spoke to KADEN many more times about me and that KADEN said:

A. He was still having problems with me and that he and SPROAT both wanted to fire me; and

B. He and SPROAT wanted to hire with a view toward replacing me as the head Water Safety Officer at Tower 1; and

C. He was going to hire me, but that he and SRPOAT had to figure out a way to fire me first; and

D. he was going to open a new tower at Haena Beach Park at the end of the road on the North Shore of Kauai; and

E. his plan was to hire WSO Stine, start WSO Stine there, find a way to get rid of me and then have WSO Stine take over at Tower 1.

39

124.   WSO Stine also told me that in January 2002, Tower 9 at Haena was opened, KADEN came to Tower 9 and again said that he and SPROAT were going to find a way to fire me and then have WSO Stine take over at Tower 1.

125. WSO Clay Wolcott has been a Water Safety Officer with the COUNTY since about 1999.  I have known WSO Wolcott ever since I started working with the COUNTY.

126. Late last year, WSO Wolcott told me that he wanted to tell me something about KADEN and SAGE.

127.  WSO Wolcott told me that by October 2001, he had become sick and tired of SAGE not doing his job as a Water Safety Officer and endangering the lives of beachgoers and other WSOs.

128.  WSO Wolcott told me that in October 2001, he went to the tower where SAGE was working and told SAGE that if he did not stop coming to work late, leaving his tower without permission, leaving lifesaving equipment out overnight, smoking marijuana while on duty, failing and refusing to obey direct orders, and

40

calling in sick to work and then surfing right in front of him, he was going to make a formal complaint about him with KADEN.

129. WSO Wolcott told me that when he told SAGE that he was going to report him and his misconduct to KADEN, SAGE started laughing and that when he asked SAGE why he was laughing SAGE told him that:

A.    KADEN would never do anything to him; and

B.    he and KADEN go way back and that he had something on KADEN; and

C.    he and KADEN have been friends and "partners in crime" for a long time.

130. WSO Wolcott also told me that he asked SAGE what he meant by the statement that he and KADEN had been "friends and 'partners in crime' for a long time" and SAGE replied, "that's right, I forgot. You're not from here, so you don't know about me and Bob, do you? He and I have been making money dealing together for a long time. If you ever mess with me again, you'll be sorry."

131. In late March 2005, way after KANANI and I

41

filed this lawsuit, the COUNTY and KFD, by and through
Robert Westerman, a newly-appointed KFD chief,
contacted me and falsely accused me of theft by
deception and defrauding my time records and threatened
me with formal disciplinary action and possible
criminal prosecution.

132.  I immediately contacted my HGEA union
representative and my lawyers.  They demanded an
investigation into the false accusations of fraud and
theft leveled by the COUNTY and KFD against me.

133.  After several weeks of investigation and
inquiry on the part of me, the HGEA and my lawyers, the
charges of fraud and theft were deemed to have been
unfounded and without merit.  Consequently, the COUNTY
and KFD were unable to take any disciplinary action or
formal action any against me and I was once again
completely exonerated of any wrongdoing.

134.  In April 2005, during the investigation of
the false theft and fraud charges against me, KFD and
the COUNTY, by and through KFD Chief Westerman, falsely
accused me of being a substance abuser and a chronic

alcoholic.

135. I was not then, nor am I now, a substance abuser or an alcoholic. Nonetheless, in May 2005, the COUNTY and KFD ordered me to take a force leave with pay under the pretense of having to take care of a substance abuse problem that I simply never had.

136. That same day, I was examined by Dr. Goodale, a Kauai physician. Dr. Goodale certified me as not having a substance abuse problem at all and cleared me to return to work at Tower 1 immediately.

137. Ever since my having been falsely arrested, KANANI and I have both been under the care of psychologist Carol Marsh for stress related to what SPROAT, KADEN, SAGE KFD and the COUNTY have done to me. Our marriage and our lives have both been altered forever and we have suffered greatly at their hands.

138. I have also learned that KADEN is a very powerful, politically connected person. Mayor Mary Anne Kusaka had appointed him as a planning commissioner back in 2002, the same time that he was planning and scheming to get me fired.

43

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Executed this 5TH day of January 2006 at Lihue, Kauai, Hawaii.

_____
CARL RAGASA

**DECLARATION OF CARL RAGASA; Carl Ragasa and Kanani Ragasa v. County of Kauai, et. al, In the United States District Court for the District of Hawaii, Civil No. CV 03-00162 (BMK).**