# DEPOSITION OF CARL RAGASA VOL II TAKEN 10/13/04

*Page 263 to Page 503*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

**EXHIBIT 1**

Page 283

(1) it that you wrote this letter in August of 2003,
(2) almost a year and a half later?
(3) A. Oh. I can't even recall why.
(4) Q. And the reason for my question is I wanted
(5) to know did you write a previous letter, closer to
(6) the time of the incident?
(7) A. I don't think so. I think it was after
(8) the arrest.
(9) Q. And you were — I think you were arrested
(10) in late March of 2002; right?
(11) A. Yeah.
(12) Q. Because I was just curious because there
(13) seemed to be a long time period between the time
(14) that the incident occurred and the drafting of this
(15) letter.
(16) A. Uh-huh.
(17) Q. You would agree with that —
(18) A. Yeah.
(19) Q. — it's kind of a long time?
(20) A. Yeah.
(21) Q. Do you have an idea or thought at this
(22) point in time why there was such a long gap? Do you
(23) have an explanation for that?
(24) A. Yes. We just wanted to see if and prove
(25) that Sid — any chance or any way he could be

Page 284

(1) certified.
(2) Q. Okay.
(3) A. And it's impossible that he could be, not
(4) only from the memos that the USLA guidelines has,
(5) but by Randy, guys, because they took the class.
(6) Q. So this was your attempt to determine
(7) whether or not Kini would have been considered
(8) qualified to train?
(9) A. Yeah. From what Randy, guys, already
(10) said, he's not. We had to like try see if we could
(11) find out for sure by getting the books and reading
(12) it and coming to the conclusion no.
(13) Q. So your understanding is the conclusion
(14) was what?
(15) A. He's not certified.
(16) Q. He's not certified and he's not qualified?
(17) A. Yes.
(18) Q. This is a letter that was addressed to a
(19) Mr. Chris Brewster —
(20) A. Uh-huh.
(21) Q. — is that correct?
(22) A. Yes.
(23) Q. Who is Mr. Brewster?
(24) A. The head of the USLA, whatever.
(25) Q. Is the USLA the entity that certifies the

Page 285

(1) entities, the lifeguards and — for the purpose of
(2) lifesaving?
(3) A. They certify agencies, yeah, not a single
(4) person.
(5) Q. All right. Let me now hand you what I'd
(6) like to have marked as Exhibit 3.
(7)     (Exhibit 3 marked for identification.)
(8)     (Discussion off the written record.)
(9) BY MS. CHANG:
(10) Q. Do you recognize this document, sir?
(11) A. Huh? Excuse me?
(12) Q. Do you recognize the document?
(13) A. Yes.
(14) Q. It is addressed to Carl Ragasa and the
(15) date is November 10, 2003. Do you recall receiving
(16) this letter from Mr. Brewster?
(17) A. Yes.
(18) Q. And this letter, would it be fair to say,
(19) is in response to your letter of August 27 —
(20) A. Yes.
(21) Q. — 2003?
(22) I guess your letter of 2003 was not just a
(23) letter. It was actually a complaint —
(24) A. Yeah.
(25) Q. — filed with the USLA?

Page 286

(1) A. Yes.
(2) Q. What is your understanding of the USLA's
(3) response to you with respect to whether or not
(4) Firefighter Kini was sufficiently trained to
(5) sufficiently — had sufficient hours to have trained
(6) you?
(7) A. Try repeat the question, please.
(8) Q. What is your understanding — let me just
(9) ask simply this: What is your understanding of the
(10) USLA's response, Mr. Brewster's response to your
(11) complaint?
(12) A. He couldn't answer me clearly. He could
(13) never answer me clearly and direct of my questions
(14) I was asking him.
(15) Q. I'm going to ask you to take a look at
(16) paragraph number two.
(17) A. Which one is that? In the front?
(18) Q. Yeah, in the front. I'm sorry. First
(19) page, paragraph number two, starting with, Your
(20) complaint.
(21) A. Uh-huh.
(22) Q. The first sentence says: Your complaint
(23) was thoroughly investigated by USLA.
(24) A. Yes.
(25) Q. Do you have any reason to believe that Mr.

### Page 291

(1) responsive in responding back to your emails?
(2) A. Yes, until I -- we found out that he
(3) wasn't certified by emailing him certain things. He
(4) just ended it with a kind of strong answer. I don't
(5) think you have that.
(6) Q. Let's go back to paragraph number two.
(7) A. Okay.
(8) Q. It says, On November 6, 2003, our National
(9) Certification Committee discussed the complaint in
(10) detail and concluded that the Kauai Fire Department
(11) has appropriately followed the requirements of the
(12) USLA lifeguard agency certification program, and
(13) based on all information available to us, remains in
(14) compliance.
(15)    I'm sorry. Did you get that, what we're
(16) talking about?
(17) A. No, because I was reading. I never know
(18) where you was reading until --
(19) Q. I'm sorry.
(20) MR. ZENGER: Paragraph two.
(21) THE WITNESS: Oh. Right here.
(22) MR. ZENGER: Yeah.
(23) BY MS. CHANG:
(24) Q. First page, paragraph two.
(25) A. I thought you just read that one.

### Page 292

(1) Q. No. We just read the first sentence.
(2) A. Oh.
(3) Q. Okay? The second sentence begins: On
(4) November 6, 2003 our National Certification
(5) Committee discussed the complaint in detail.
(6)    Let me just stop right there. Do you know
(7) who the members are of the National Certification
(8) Committee?
(9) A. No.
(10) Q. Do you know if any people on the National
(11) Certification Committee, besides what you believe
(12) Brewster has, has any connection whatsoever with any
(13) of the defendants in this lawsuit?
(14) A. I don't -- the question is kind of -- no.
(15) BY MS. CHANG:
(16) Q. Okay. Do you have any reason to believe
(17) that the National Certification Committee did not
(18) meet on November 6, 2003 to discuss your complaint?
(19) A. No, I never.
(20) Q. So you have nothing that would tell you
(21) that they didn't meet to discuss the complaint?
(22) A. Yeah. I have nothing.
(23) Q. Their conclusion --
(24) A. Wait. Try go back. I think I knew that
(25) they -- they said -- they write to me that they had

### Page 293

(1) one meeting.
(2) Q. Right.
(3) A. So I don't know what you meant.
(4) Q. Do you have any reason to believe the
(5) meeting didn't actually happen even though they said
(6) it did?
(7) A. Oh.
(8) Q. That's my question.
(9) A. I don't know that question. I don't know
(10) how to answer that question. Did I know that they
(11) had a meeting?
(12) Q. No. I mean, they say they have a meeting.
(13) A. Uh-huh.
(14) Q. Do you believe they had a meeting?
(15) A. Yeah.
(16) Q. Okay. And they have -- they -- the
(17) meeting -- the document says the meeting concluded
(18) that the fire department has appropriately followed
(19) the requirements of the USLA lifeguard agency
(20) certification program, and based on all information
(21) available to us, remains in compliance.
(22)    Do you have any information that would
(23) dispute that conclusion?
(24) A. Yeah. They say this after -- after I got
(25) arrested and all this. They made it after the fact.

### Page 294

(1) This wasn't before. They didn't have -- they didn't
(2) have the -- they never -- what Sproat never do is
(3) apply in that agency like parks and rec did. So
(4) when we transferred to the fire department, just us
(5) transferred. They had to make their own application
(6) to get in the agency. In 1996, parks and recreation
(7) was the first to be on that agency.
(8) Q. Okay. And that was -- is your --
(9) A. So when we transfer to the fire
(10) department, that doesn't mean in Brewster's words we
(11) have it. That doesn't mean he automatically gets
(12) in. No. We just under them. They can't come in
(13) to -- you know, he has to do -- he has to be
(14) employed, too, with us. He has to do a thousand --
(15) he has to do our training every year just to be
(16) certified. He has to do all this training that we
(17) do and more. I can just go on and on. Just -- I
(18) can prove -- we can prove it, that he's not
(19) certified, no matter what Brewster said.
(20) Afterwards, he was throwing me out.
(21) Q. So is it your position that you know
(22) better than Mr. Brewster what the US Lifesaving
(23) Association requirements are?
(24) A. No, not in his point of view, but in mine,
(25) as one water person on the north shore, I know he

Page 295

(1) wasn't qualified to teach us and I know -- Randy
(2) knew. Randy is the only one is certified, so that's
(3) how I know and that's how we all know he's not
(4) certified.
(5)     Allen Arquette and Randy Ortiz were
(6) lifeguards when he was a fireman, and the only
(7) training he had is Red Cross. Red Cross does not
(8) meet the standards of USLA at all.
(9) Q. I understand that --
(10) A. And when --
(11) Q. I'm sorry. Go ahead.
(12) A. When USLA came into effect was in 1992.
(13) He was already a fireman. It's impossible for him
(14) to get the thousand hours under USLA agency when he
(15) wasn't even -- didn't even have an agency until
(16) 1998. Even Cannady (phonetic), Francis Cannady told
(17) the fire chief not to have -- teach the lifeguards
(18) anything. Sproat said okay, and then he still did
(19) 'em.
(20) Q. I understand --
(21) A. You want more to show you that he's not
(22) certified?
(23) Q. No. Because we're not --
(24) A. Okay.
(25) Q. You understand -- I understand that's your

Page 296

(1) position as a water man and that you are expressing
(2) your opinion that based on your evaluation, you do
(3) not believe that Kini is qualified.
(4)     My question to you is: Does this letter
(5) indicate that Kini was indeed the lifeguard
(6) instructor and qualified under this program?
(7) MR. ZENGER: I'll just object on the
(8) grounds that the letter speaks for itself.
(9) BY MS. CHANG:
(10) Q. You can answer the question.
(11) A. You've gotta repeat the question. I --
(12) MS. CHANG: Would you read back the
(13) question, please?
(14)     (Record was read as requested.)
(15) A. This letter that Brewster wrote?
(16) BY MS. CHANG:
(17) Q. Yes.
(18) A. That's what Brewster's saying?
(19) Q. Yes.
(20) A. That's what he's saying, yes.
(21) Q. Okay.
(22) A. But can I --
(23) Q. The question -- the question is about, you
(24) know, whether or not you agree that's what Brewster
(25) is saying. I'm not asking if you agree with it. I

Page 297

(1) understand that you don't agree with it. I just
(2) want to make sure that you agree that this is what
(3) the letter indicates.
(4) A. Yes.
(5) Q. Okay. All right. Let's go back to that
(6) second paragraph, where it says your complaint was
(7) thoroughly investigated, and then we've gone through
(8) the sentence where it says, The National
(9) Certification Committee discussed the complaint and
(10) concluded that the fire department appropriately
(11) followed the requirements of the lifeguard agency
(12) certification program and remains in compliance.
(13) Okay.
(14)     It goes on to say, Specifically, the
(15) committee determined that the experience level of
(16) Kauai's lead training officer for ocean lifeguards
(17) exceeds USLA standards by a significant margin. On
(18) November 8th, 2003, the USLA board of directors
(19) unanimously agreed with that determination.
(20)     My question to you is: Do you know anyone
(21) on the USLA board of directors?
(22) MR. ZENGER: Asked and answered.
(23) MS. CHANG: No. I didn't ask about board
(24) of directors. I asked about the certification
(25) committee.

Page 298

(1) MR. ZENGER: Okay. Sorry. You're right.
(2) Strike that.
(3) A. I don't even know which one -- the same
(4) one?
(5) BY MS. CHANG:
(6) Q. Yeah. Same paragraph, last sentence: On
(7) November 8th, 2003, the USLA board of directors --
(8) A. Okay, okay.
(9) Q. Do you know anybody on the USLA board of
(10) directors?
(11) A. You mean on Kauai? Is there anybody on
(12) Kauai --
(13) Q. No, no. This would be the USLA board of
(14) directors. I don't know who's on the board of
(15) directors. I want to know if you know of anybody on
(16) the --
(17) A. I don't know nobody on the -- no.
(18) Q. So do you have any -- do you have any
(19) information that any one of the defendants has any
(20) contacts or friendships with people on the board of
(21) directors of USLA?
(22) A. Yeah, from what I heard from.
(23) Q. What did you hear and who did you hear it
(24) from?
(25) A. I no can recall who I hear 'em from, but I

### Page 303

(1) saying?
(2) A. Yeah. We're just under -- we're just
(3) under the fire department. That doesn't mean
(4) they're transferring to us.
(5) Q. All right. The next sentence in that same
(6) third paragraph states: We certify the program
(7) based on the information provided at the time with
(8) respect to certain elements. So long as the
(9) standards continue to comply with those asserted in
(10) the original application, the validity of the
(11) certification remained.
(12)     So isn't Mr. Brewster saying here that the
(13) certification is still valid even though the
(14) transfer has occurred?
(15) A. That's only the lifeguards, not the
(16) firemens. And all the training has to be done
(17) yearly to be -- to hold that certification. You
(18) must do the swim test, these -- yearly. He never
(19) even do one test yet.
(20) Q. Okay.
(21) A. Okay.
(22) Q. Let's talk about that. Is there anything
(23) in this sentence from Mr. Brewster that suggests
(24) that it's only lifeguards and not the firemen?
(25) A. Only lifeguards? Yeah.

### Page 304

(1) Q. You said --
(2) A. Well, he emailed me something that's
(3) saying that the firemens don't immediately jump into
(4) -- they have to apply for their own -- I have that
(5) in his email, but, of course, you guys don't have
(6) that. I think we got all that.
(7) Q. Well, we can get to that, but let's just
(8) concentrate on this letter first, since this appears
(9) to be his official response to your complaint.
(10)     (Ms. Richards in attendance.)
(11) A. Okay.
(12) BY MS. CHANG:
(13) Q. The next sentence states: The
(14) certificate sent to the agency at the time stated
(15) that it was effective so long as the agency
(16) continues to maintain the standards represented to
(17) the board of directors. The board of directors has
(18) concluded that those standards did not decline.
(19)     Do you agree with that statement?
(20) A. Yeah.
(21) Q. Next paragraph: A key concern detailed in
(22) your letter is that a firefighter named Kini was
(23) assigned in January 2001 to take over, quote, all
(24) open water training and certification of all the
(25) water safety officers, unquote. You stated --

### Page 305

(1) meaning Brewster's stating that you stated -- quote,
(2) Once again, being Fireman Kini had been a KFD
(3) fireman since March 1990, it is simply impossible
(4) for him to ever have been qualified by USLA to be
(5) the lead instructor for any USLA sanctioned open
(6) water courses, end quote.
(7) A. Uh-huh.
(8) Q. Is he quoting you correctly, sir, first of
(9) all?
(10) A. Is he quoting me?
(11) Q. No. Is he quoting you correctly? Is that
(12) what you said?
(13) A. Yeah.
(14) Q. Okay. And that's basically what you told
(15) us this morning --
(16) A. Yes.
(17) Q. -- is that correct, that he couldn't have
(18) been qualified --
(19) A. Yeah.
(20) Q. -- in your opinion?
(21)     Okay. The next sentence, on page two --
(22) A. Yes.
(23) Q. Same place?
(24) A. Yes.
(25) Q. As previously explained, USLA as a

### Page 306

(1) national body does not certify or qualify either
(2) lifeguard or lifeguard instructors. Rather, we
(3) certify lifeguard agencies which demonstrate that
(4) they meet our published standards. They are then
(5) required to continue to meet those standards as a
(6) condition of maintaining certification.
(7) A. Yes.
(8) Q. You agree with that?
(9) A. Yes.
(10) Q. Next paragraph: One of the standards for
(11) the lead instructor of a USLA certified program is,
(12) quote, must have worked a minimum cumulative total
(13) of 1,000 hours of employment complied in no fewer
(14) than three seasons as a seasonal open water
(15) lifeguard or full time open water lifeguard at a
(16) lifeguard agency which meets the standards of USLA,
(17) unquote. Okay?
(18) A. Yes.
(19) Q. Do you agree with that standard?
(20) A. Yes.
(21) Q. This applies to the lead instructors.
(22) This experience requirement does not, per se,
(23) require that the lifeguard agency for which the lead
(24) instructors must -- lead instructors have worked
(25) must have been USLA certified at the time the

503

C E R T I F I C A T E

STATE OF HAWAII                    )
                                   ) SS.
CITY AND COUNTY OF HONOLULU        )

        I, SUE M. FLINT, Notary Public, State of Hawaii, do hereby certify:

        That on October 13, 2004, at 8:40 a.m., appeared before me Carl Ragasa, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn;

        That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

        I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

        DATED this _13th_ day of _November_, 2004, in Honolulu, Hawaii.

_____Sue M. Flint_____
SUE M. FLINT, RPR, CSR 274
Notary Public, State of Hawaii
My Commission Exp: July 23, 2007